UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ELLEN SKALKA,

           Plaintiff,

-against-                        NOT FOR PUBLICATION
                                     MEMORANDUM & ORDER
COMMISSIONER OF SOCIAL SECURITY,  16-CV-3228 (CBA)

           Defendant.
------------------------------------------------------------x

**AMON, United States District Judge:**

Before the Court are cross-motions for judgment on the pleadings in the instant action, an appeal from a Social Security Administration ("SSA") Administrative Law Judge's ("ALJ") September 11, 2014 decision denying Social Security Disability Insurance ("SSDI") benefits to Plaintiff Ellen Skalka. For the reasons stated below, the Court grants the government's motion and denies Skalka's.

## BACKGROUND

On December 6, 2012, Skalka applied for SSDI benefits, claiming disability since September 12, 2012. (Court Tr. ("Tr."), D.E. # 9 at 142.) Skalka worked 40 years as a school speech therapist, instructing students with disabilities from ages 15 to 21. She is now 68 years old and unemployed. (Id. at 80, 158–59, 202, 223.) She has post-traumatic stress disorder ("PTSD") because of a September 12, 2012 incident during which a student punched her in the head and left her with a concussion and other injuries. (Id. at 3, 19, 158, 172, 202.) In resolving the parties' cross-motions, the Court focuses on recounting the medical records detailing Skalka's mental impairment rather than her physical impairments because they form the basis for Skalka's appeal of the ALJ's decision.

After the SSA denied Skalka's application for benefits, she requested an ALJ hearing on June 25, 2013. (Tr. at 96–105.) The SSA granted the request, scheduling the hearing for

1

September 4, 2014 in Jericho, New York. (Id. at 57, 106–26, 129–30, 135–41.) Skalka testified at the proceeding as did Esperanza Distefano, a vocational expert. (Id. at 57, 127–28, 131–34.) The record includes reports prepared by two longer-term physicians: Brian Moynihan, Skalka's primary care physician since 2010, and Catherine Masterson, a clinical psychologist who has treated Skalka weekly since December 2012. (Id. at 160–61, 237–42.) The record also includes documents from Abraham Glasman, a neurologist; Paul Herman, a psychologist; Jerome Caiati, an internist; and A. Stockton, a medical consultant. (Id. at 182, 189, 202, 221–24.) The Court explains the submissions and the testimony of each of these individuals in turn.

I. Documentary Evidence and Testimony

A. Moynihan

The administrative record includes five pages of notes related to Moynihan's examinations of Skalka between July 19, 2012 to May 4, 2013. (Id. at 103, 197–201.) Moynihan's notes show that Skalka visited Moynihan on September 24, 2012—twelve days after she was punched by one of her students—complaining of high stress, tension, and dizziness. (Id. at 198.) On December 3, 2012, Skalka reported having frequent panic attacks, being a "ball of anxiety," and seeing a therapist. (Id. at 200.) She said Xanax was not helping her. (Id.) Moynihan diagnosed her with PTSD. (Id.) In her benefits application, Skalka reported taking Alpraxolam, Diazepam, and Lexapro, which Moynihan prescribed for her anxiety. (Id. at 160.)

B. Masterson

The administrative record also includes several documents from Masterson. (Id. at 237–42.) On July 31, 2014, Masterson performed a mental-health evaluation of Skalka. (Id. at 242.) Masterson noted that she had been having weekly therapy sessions with Skalka, and that Skalka was taking Lexapro and Xanax. (Id.) Masterson did not find Skalka to be a risk to herself or

others, or to have psychosis, hallucinations, delusions, impulsive or reckless behavior, or problems with daily activities. (Id.) However, Masterson found mild issues with mood disturbance, cognition, memory, concentration, and social skills, as well as severe issues with her "Medical/Physical Condition" and job performance. (Id.)

On September 3, 2014, Masterson performed another evaluation of Skalka with an eye toward determining her capacity to work ("residual functional capacity" in the parlance of the Social Security Administration). (Id. at 237.) Masterson first noted that she could not assess Skalka's understanding, memory, or ability to carry out instructions. Masterson stated that Skalka's anxiety symptoms "preclude[d] her [from] entering [the] workplace"; that Skalka could not carry out detailed instructions when experiencing anxiety in non-work settings; that her concentration likely would be "impaired in work settings"; and that her anxiety would "interfere extremely with [her] ability to respond appropriately to students, coworkers, work pressures [and] changes in work routine." (Id. at 238–39.) Masterson noted that Skalka had extreme limitations in responding appropriately to work pressures. (Id. at 238.) According to Masterson, Skalka had nightly sleep disturbances, and those disturbances interfered with her waking up. (Id.)

Masterson also created a "Treatment Summary," dated September 3, 2014. (Id. at 239–41.) According to the summary, Masterson first met with Skalka on December 5, 2012, (see id. at 239), a day before Skalka applied for SSDI benefits. Masterson diagnosed Skalka with severe anxiety and panic caused by PTSD. They had fifty-nine PTSD therapy sessions after their first visit. (Id.) Masterson also noted that Skalka had a psychiatric consultation with Robert Katz, but the record does not include any documents from the consultation. (Id. at 239.) Masterson stated that Skalka was cooperative with treatment and attended sessions regularly. (Id. at 240–41.)

According to Masterson, Skalka's "anxiety, panic, distress, tearfulness, loss of confidence, and feeling overwhelmed [shortly after the incident] were so severe" that she asked a friend to go to her school and provide her boss with her termination paperwork. (Id. at 241.) "The simple act of talking about [Skalka's] job triggered anxiety and tearfulness," and she could not go near the school, students, or staff without suffering a panic attack. (Id.)

Masterson noted some improvement over the years; Skalka "no longer gets panic attacks daily, but now only 2-3 times a week, with her medication." (Id.) Still, Masterson found the panic attacks to be severe or nearly severe. (Id.) Skalka complained of "generalized anxiety" and a "new symptom of free-floating anxiety/agoraphobia," which "makes it difficult for her to go to crowded places, like the mall, or the movies or concerts, etc., or use public transportation, like trains." (Id.) Masterson noted that Skalka still "forces herself" to go to crowded places and use public transportation "while enduring considerable distress." (Id.)

Masterson did not provide any notes from her therapy sessions with Skalka. At the hearing, the ALJ noted the absence of notes, and Skalka's counsel stated that the summary was "in lieu of treatment notes" because Masterson kept only shorthand notes, which she summarized, and "doesn't keep treatment records." (Id. at 64.)

### C. Glasman

On October 23, 2012, Glasman examined Skalka. (Id. at 202.) According to Glasman, she was "somewhat tearful throughout the course of her examination," although she had a normal higher integrative function. (Id.)

### D. Herman

On January 29, 2013, Herman performed a consultative examination of Skalka. (Id. at 182–86.) According to Herman, Skalka had random panic attacks, had difficulty leaving her bed,

4

was tired, and had a tense affect. (Id. at 183–84.) Herman reported that Skalka regularly sees a psychiatrist and therapist, and has been prescribed Lexapro, Xanax, and Diazepam. (Id. at 182.) Skalka told him that she was "too fearful" to return to her prior workplace, and that she did not consider other jobs because "she is 63 and she is trained to be a speech pathologist." (Id. at 183.)

Still, Herman noted that Skalka was "friendly and cooperative with adequate social skills"; had regular posture, eye contact, and speech patterns; and possessed a "neutral" mood, "coherent and goal oriented" thought processes, fair insight and judgment, and average to above-average cognitive functioning. (Id. at 183–84.) Moreover, Skalka reported no "significant difficulties" with her daily activities, saying that she socializes with friends and family members, watches television, reads, and goes to the movies. (Id. at 184.)

Based on the consultation, Herman diagnosed Skalka with panic disorder without agoraphobia. (Id. at 185.) He concluded that Skalka could follow simple directions and instructions, perform simple tasks, maintain attention and concentration for low-level employment, learn new tasks, perform familiar complex tasks, make simple work-related decisions, relate adequately with others, and maintain her own funds. (Id.) He also concluded that she would find difficult "appropriately dealing with stress" and "maintaining a regular schedule," and that "returning to her prior work setting is something that may be too much for her." (Id.) Nonetheless, he concluded that her psychiatric problems "d[id] not appear to be significant enough to interfere with [her] ability to function on a daily basis to the extent that all vocational functioning would be completed." (Id.)

### E. Caiati

On March 15, 2013, Caiati also performed a consultative examination of Skalka. (Id. at 189–93.) Skalka told Caiati that she cooks, shops, showers and dresses herself, watches television, listens to the radio, reads, goes out to eat, and socializes with friends. (Id. at 190.)

### F. Stockton

On May 21, 2013, Stockton performed a consultative examination of Skalka with a focus toward her residual functional capacity and her mental function. (Id. at 221–24; see also id. at 90–91.) Stockton noted Skalka's ability to cook, perform household tasks, travel alone, shop, handle money, socialize with friends, "interact appropriately" with coworkers and supervisors, adapt to changes in the work environment, and engage in hobbies. (Id. at 223.) Still, Skalka reported intermittent panic attacks and sleep disorder, and Stockton noted a tense affect. (Id.) For her anxiety symptoms, Skalka was taking Lexapro, Xanax, and Diazepam and attending "intermittent" outpatient therapy. (Id.)

Stockton reached largely positive conclusions about Skalka's mental health. In general, Stockton found no significant limitations with Skalka's understanding, memory, concentration, persistence, and social interaction, although Stockton found moderately limited Skalka's ability to "perform activities within a schedule," "maintain regular attendance," "be punctual within customary tolerances," and "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (Id. at 221–22.) Stockton in general found Skalka's adaptation skills to be moderately limited, although Stockton noted no significant limitation with her ability to "take appropriate precautions" in light of "normal hazards." (Id. at 222.)

### G. Skalka

At the September 4, 2014 hearing, Skalka testified before the ALJ. (See id. at 59–73.) Skalka stated that she took Xanax three to five times a week, Valium once a week, and Lexapro daily. (Id. at 64–65.) She noted that she had retired shortly after the incident because of her "emotional disability," that she recently moved into a senior living community, and that she no longer lived with anyone. (Id. at 59, 61–62, 66, 79.) Skalka noted that she had difficulty going back to the school and felt non-functional shortly after the incident. (Id. at 62.) She testified that she did not try to attain other employment because speech therapy "is what [she has] done [her] whole life"; because "all [her] confidence is gone"; because entering an office building, for instance, would cause her to have a panic attack; and because she had a "fear of people" and "situations [she did not] know." (Id. at 62, 69–70.) Skalka said she had not made any new friends in two years, and that she did not talk to strangers, including friends of her friends, "unless [she] ha[d] to." (Id. at 70–71.)

During a typical day, Skalka testified that she takes a shower and tries to perform household chores. (Id. at 65.) She sometimes shops for food, socializes with friends, eats with them, and plays mahjong. (Id.) Skalka says that going to the movies is now an issue, because there are "too many people" and she gets panic attacks. (Id. at 65–66.) Skalka said she "ha[sn't] been to the movies . . . probably since" the incident. (Id. at 66.) Skalka also testified that she drives in the neighborhood to small food stores, but not to malls, where she has "a lot of trouble." (Id. at 68–69.) Skalka also noted that she traveled to Curacao once for her nephew's wedding, and that she hopes to visit her son and his family in California. (Id. at 66–67.) When her son's family lived nearby, Skalka, her boyfriend, her son, and her daughter-in-law would bring her granddaughters to the museum, shops, playground, and other places. (Id. at 67.) Skalka also has dinner outside

her home and "do[es] family things" with her boyfriend and his family. (Id. at 67–68.) Skalka said that she visits New York City to see friends and watch Broadway shows, but that she must take a train with a friend. (Id. at 68.) She said she used to be an "avid reader," reading two books a week, but that her concentration has diminished to a point that she needs months to read one book. (Id. at 71.)

H.  Distefano

Finally, the ALJ considered Distefano's testimony during the hearing. (See id. at 73–76.) Distefano testified that an individual of Skalka's age, education, and prior experience could not serve as a speech therapist, even if she is limited to low-stress jobs, occasional contact with coworkers and supervisors, and no contact with the general public. (Id. at 74.) However, Distefano testified that she could work as a file clerk, general office clerk, or data examination clerk, and that she could maintain such a job while taking three to four days off a month. (Id. at 75.) Finally, Distefano said Skalka would have transferable skills from her speech therapy experience: "expressive communication skills," "clerical skills that are transferable across all industry lines," "the ability to keep records," the ability to "work with organizations," problem solving, and knowledge and understanding of policies and procedures. (Id. at 76.)

II.  The ALJ's Decision

A week after the hearing, on September 11, 2014, the ALJ issued a decision denying SSDI benefits. (See id. at 17–28.) The ALJ found Skalka's statements about the "intensity, persistence[,] and limiting effects" of her PTSD symptoms "not entirely credible." (Id. at 23.) The ALJ found that Skalka could perform low-stress work with occasional contact with supervisors and coworkers and no contact with the general public. (Id. at 24.) The ALJ found support for this finding in Masterson's and Herman's records. (Id.) Otherwise, the ALJ found no "basis to limit

8

[Skalka] further." (Id. at 24.) The ALJ cited to favorable findings in Herman's report. (Id.) Moreover, the ALJ noted that Skalka "testified to a wide range of daily activities and good social functioning, which belies her allegation of mental disability." (Id. at 25.) The ALJ emphasized that Skalka had a "conservative" course of treatment, and that she did not try to find other work because of her age and training as a speech pathologist. (Id.)

The ALJ assigned less weight to other records and findings. Citing the absence of "evidentiary support," the ALJ gave "little weight" to Herman's conclusion that Skalka would have difficulty maintaining a regular schedule. (Id.) The ALJ gave "little weight" to Stockton's opinion because it was "internally inconsistent." (Id.) The ALJ noted that, at one point, Stockton found moderate limitations in responding appropriately to changes in the work setting and getting along with coworkers and peers without distracting them or exhibiting behavioral extremes, but that, at another point, Stockton said Skalka "would be able to . . . interact appropriately with coworkers and supervisors[] and adapt to changes in the work environment." (Id.) The ALJ also assigned "little weight" to Masterson's opinion. (Id. at 26.) The ALJ said that the opinion "is not well supported," that the underlying treatment notes were unavailable, and that Masterson's diagnoses are contradicted by Skalka's testimony and Herman's "largely benign" report. (Id.)

After determining Skalka's residual functional capacity, the ALJ determined that she could not perform her past work in speech therapy; neither side challenges this finding. (Id.) The ALJ then turned to determining whether Skalka could perform other work in the national economy. The ALJ noted that Skalka was "closely approaching retirement age," has at least a high school education, and is able to communicate in English. (Id.) The ALJ also focused on Distefano's testimony that speech therapists gain transferable skills in communication, problem solving, and recordkeeping. (Id.) The ALJ credited Distefano's testimony that an individual in Skalka's

9

circumstances could work as a file clerk, general office clerk, or data examination clerk, and that her skills would help in those jobs. (Id. at 27.) She concluded "[b]ased on the application for a period of disability and disability insurance benefits filed on December 4, 2012, [that] the claimant is not disabled under . . . the Social Security Act." (Id.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[a]ny individual, after any final decision of the Commissioner made after a hearing to which [s]he was a party, may obtain a review of such decision by a civil action . . . ," and the Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision . . . , with or without remanding the cause for a rehearing." Because the Appeals Council denied review of the case, "the ALJ's decision, and not the Appeals Council's, is the final agency decision." Lesterhuis, 805 F.3d at 87.

"[T]he ultimate determination of whether a person has a disability within the meaning of the [Social Security] Act belongs to the Commissioner" of Social Security. Id. The Court "may set aside the Commissioner's decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." Greek v. Colvin, 802 F.3d 370, 374–75 (2d Cir. 2015). The Court also may not "affirm an administrative agency on grounds different from those considered by the agency." Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)).

With respect to legal findings, the Court generally will remand if "there is a reasonable basis for doubt whether the ALJ applied correct legal principles." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). In reviewing the ALJ's factual findings for substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013). The

substantial evidence standard is "a very deferential standard of review" and requires the Court to uphold factual findings unless "a reasonable factfinder would <u>have to conclude otherwise</u>." <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original).

## DISCUSSION

**I. Background on SSDI Benefits**

An individual requesting SSDI benefits must be "insured" and "under a disability." <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 801 (1999). "The Commissioner of Social Security has adopted regulations that provide a five-step framework for evaluating" disability. <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008). The first three steps ask: (1) "whether the claimant is presently employed"; (2) "whether the claimant has a 'severe impairment' that limits her capacity to work"; and (3) "whether the claimant has an impairment that is listed in Appendix 1 of the regulations." <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996). The parties do not dispute the ALJ's findings with respect to these steps. Accordingly, the Court accepts that (1) Skalka is not presently employed; (2) her PTSD constitutes a severe mental impairment under the SSA's regulations; and (3) her PTSD symptoms are not equivalent to the mental disorders listed in the regulations as disabilities <u>per se</u>, <u>see</u> 20 C.F.R. pt. 404, subpt. P, app. 1.

The fourth and fifth steps require the ALJ to determine whether an individual is entitled to SSDI benefits despite her impairment not being listed as a disability <u>per se</u>. An ALJ must determine an individual's "residual functional capacity," or RFC. The RFC measures "the most [a disabled individual] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ considers all "relevant ... evidence" and "medically determinable impairments." <u>Id.</u> §§ 404.1545(a)(2), 404.1545(a)(3). In assessing the RFC, the ALJ must "identify the individual's

functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis . . . ." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam).

During the fourth step of the SSA's framework, the ALJ "considers whether the claimant's [RFC] permits [her] to return to [her] past relevant work." Lesterhuis, 805 F.3d at 86 n.2. "If so, the claimant is not disabled." Id. Here, the ALJ determined that Skalka could not return to her past work and the parties do not dispute this finding. At step five, the ALJ "considers, based on the claimant's [RFC] and vocational factors, whether the claimant can do other work existing in significant numbers in the national economy." Id. "If so, the claimant is not disabled." Id. Here, the ALJ determined, based on Skalka's RFC, that she could perform work as a file clerk, general office clerk, or data examination clerk and that these jobs exist in the national economy. It is only this final determination that is in dispute.

At her hearing, Skalka bore the burden of proof with respect to steps one through four, at which point the burden shifted to the Commissioner to "provid[e] evidence that demonstrate[d] that other work exist[ed] in significant numbers in the national economy that [Skalka] c[ould] do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

## II. The Treating Physician Rule

Skalka's primary contention is that the ALJ afforded inadequate weight to the diagnosis of Masterson, her treating physician, in violation of the treating physician rule. See 20 C.F.R. § 404.1527(c). In determining a Social Security applicant's residual functional capacity, the opinions of a "treating physician" merit "'controlling weight' so long as they are 'well-supported by medically acceptable . . . techniques and [are] not inconsistent with the other substantial evidence in [the record].'" Lesterhuis, 805 F.3d at 88 (citation omitted). Inversely, "the opinion

of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Greek, 802 F.3d at 375 (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)).

Here, the ALJ declined to give Masterson's testimony controlling weight. If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ "consider[s] several factors in determining how much weight the opinion should receive," including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." Id. (quoting Selian, 706 F.3d at 41); see also 20 C.F.R. § 404.1527(c). "After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." Id. The decision must include "'good reasons' for not crediting the opinion." Burgess, 537 F.3d at 129–30 (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)). The ALJ fails to provide "good reasons" if he "rest[s] his rejection of [the physician]'s opinion on flawed reasoning and fail[s] to provide any other reasons for rejecting the opinion." Greek, 802 F.3d at 376. Moreover, an ALJ fails to provide a good reason if he relies on a "factually incorrect" reason. Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010). Even when the ALJ does not recite the treating physician rule and the corresponding factors mechanically, the Court will affirm when "the substance of the treating physician rule [is] not traversed." Halloran, 362 F.3d at 32.

Although the ALJ did not discuss the length of Masterson's treatment or her expertise as a clinical psychologist in detail, the Court finds that the ALJ's decision to afford Masterson's diagnosis less-than-controlling weight was supported by "good reasons." Greek, 802 F.3d at 376.

13

The ALJ gave Masterson's diagnosis "little weight," because Masterson did not provide treatment notes and because her conclusions were in conflict with the consultative examination of Dr. Herman and Skalka's own testimony. (Tr. at 24.) Substantial evidence supports this decision.

Although Skalka's counsel relayed Masterson's explanation for why she lacked treatment notes, (id. at 64), the ALJ's decision to consider the lack of notes is consistent with SSA regulations and circuit law. See, e.g., 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."); Selian, 706 F.3d at 41 (ALJ must consider "the amount of medical evidence supporting the opinion").

Further, it was appropriate for the ALJ to criticize Masterson's diagnosis for "alleg[ing] symptoms that are at odds with [Skalka's testimony about her] admitted daily functioning." (Tr. at 26.); see 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Masterson's treatment summary indicated that Skalka had "free-floating anxiety/agoraphobia," which "makes it difficult for her to go to crowded places, like the mall, or the movies or concerts, etc., or use public transportation, like trains." (Tr. at 241.) Although Skalka testified that she did not talk to strangers "unless [she] ha[s] to," (id. at 70–71), and that she has "trouble" in malls, (id. at 68–69), substantial evidence supports the conclusion that Skalka's social problems were not as severe as Masterson's diagnosis suggests. As the ALJ noted, Skalka testified that she "goes to Broadway shows, takes her grandchildren to places such as the museum, attends her male companion's family functions, goes out to dinner, and recently took a trip to Curacao." (Id. at 26.)

Finally, the ALJ properly noted that Masterson's records are "contradicted by Dr. Herman's largely benign examination report." (Id. at 26.) Herman noted in relevant part that

Skalka had "adequate social skills," maintained regular eye contract, had a neutral mood, and socialized with family and friends. (Id. at 183–85.) Further, Herman diagnosed Skalka with panic disorder <u>without</u> agoraphobia, (id. at 185), in contrast with Masterson's diagnosis of "free-floating anxiety/agoraphobia." (id. at 241). Herman concluded that Skalka could follow directions, perform simple tasks, maintain concentration for low-level employment, learn new tasks, perform familiar complex tasks, make simple work-related decisions, and relate with others, (id. at 185)—all in conflict with Masterson's conclusion that Skalka could not work because of her PTSD. These contradictory conclusions drawn by Herman gave the ALJ further reason not to rely heavily on Masterson.

It is worth noting that the ALJ's decision to assign "little weight" to Herman's assessment that Skalka "may have difficulty . . . maintaining a regular schedule," does not render suspect her reliance on other aspects of Herman's assessment. The ALJ determined that this conclusion lacked "evidentiary support." (Tr. at 25.) And the ALJ's decision was consistent with Herman's own conclusion that despite Skalka's possible difficulty maintaining a schedule, her psychiatric problems "d[id] not appear to be significant enough to interfere with [her] ability to function on a daily basis to the extent that all vocational functioning would be completed." (Id. at 185.) The ALJ appropriately relied on the well-supported portions of Herman's assessment while discrediting those portions that lacked support. Cf. Christina v. Colvin, 594 F. App'x 32, 33 (2d Cir. 2015) ("We reject Christina's contention that the administrative law judge ('ALJ') committed reversible error by dismissing a portion of the opinion of consultative examiner, Dr. Rush, indicating that Dr. Rush thought Christina might have difficulty adhering to a work schedule . . .").

"Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). As such, the Court "'defer[s] to the Commissioner's

resolution of conflicting evidence,' and accept[s] the weight assigned to the inconsistent opinions as a proper exercise of the ALJ's discretion." Smith v. Berryhill, 740 F. App'x 721, 726 (2d Cir. 2018) (quoting Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012)). Where, as here, "the opinions of a treating physician . . . are contradicted by other substantial evidence in the record," the ALJ does not err by deciding not to give the opinions controlling weight. Id.; see also Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence."); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record.").

Because substantial evidence supported the ALJ's decision, it was not error for her to give Masterson's diagnosis less-than-controlling weight.

### III. Duty to Develop

Next, Skalka suggests that the ALJ failed to adequately develop the record regarding the progression of her PTSD subsequent to Herman's evaluation. The Court finds that the ALJ did not fail to develop the record. "[T]he ALJ generally has an affirmative obligation to develop the administrative record." Perez, 77 F.3d at 47. SSA regulations describe this duty as follows: "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d).

Skalka appears to suggest that the ALJ erred by failing to seek out information about her condition's progression subsequent to Herman's evaluation. But the record contains information

16

that post-dates Herman's evaluation; for instance, Masterson's reports. The ALJ was under no obligation to seek out further records from Herman specifically. Perez, 77 F.3d at 48 ("the fact that the ALJ did not specifically request information from [a particular physician] regarding the onset of [claimant's] disability does not demonstrate a failure to develop the record"). Skalka points to no medical records that the ALJ should have found prior to reaching her residual functional capacity determination. The only records that appear to be missing from the SSA record are Masterson's treatment notes, which, as noted above, could not be provided because Masterson "doesn't keep treatment records." (Tr. at 64.) "The ALJ is not required to develop the record any further when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability,'" as here. Janes v. Berryhill, 710 F. App'x 33, 34 (2d Cir. 2017) (quoting Perry, 77 F.3d at 48).

The Court therefore rejects Skalka's contention that the ALJ did not satisfy her duty to develop the record.

### IV. Vocational Expert Testimony

Skalka's final contention is that the ALJ erred in relying on Distefano's testimony that Skalka had transferrable skills that would allow her to work as a file clerk, general office clerk, or data examination clerk. (Tr. at 27.) At oral argument, Skalka indicated that she was relying on 20 C.F.R. § 404.1568(d)(4) which states: "If you are closely approaching retirement age . . . , we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." (D.E. # 19.) The Court rejects Skalka's contention.

A relevant Social Security Ruling requires that, "[w]hen a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision." Social Security Ruling 82-41, 1975–1982 Soc. Sec. Rep. Serv. 847, 1982 WL 31389, at *7 (1982) ("SSR 82-41"). "This evidence may be [vocational specialist] statements based on expert personal knowledge." Id. And "where job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's [residual functional capacity]." Id. at *6.

The ALJ followed this protocol adequately. At the hearing, she solicited from Distefano that Skalka acquired from her job as a speech therapist "expressive communication skills," "clerical skills," "the ability to keep records," the ability to "work with organizations," and more. (Tr. at 76.) Distefano testified that these skills would allow Skalka to work as a general office clerk, a data examination clerk, or a file clerk, and that these jobs were available in the national economy. (Id. at 75.) Relying on this information, the ALJ determined that "the claimant's acquired skills . . . would transfer . . . with very little vocational adjustment required." (Id. at 27.) The ALJ's conclusion was consistent with SSR 82-41's admonition that clerical skills can be transferred with very little vocational adjustment. SSR 82-41, at *6; Gaddis v. Commissioner of Soc. Sec., 417 F. App'x 106, 108 (3d Cir. 2011) ("[T]he ALJ determined that the skills Gaddis had gained from being a teacher were at a higher level than those required for other sedentary, semi-skilled occupations, including the occupations of examination clerk and clerical sorter, and were thus transferable to those occupations with little, if any, vocational adjustment . . . . This is

sufficient."); see also Bachard v. Commissioner of Soc. Sec., 628 F. App'x 685, 687 (11th Cir. 2015); Jensen v. Barnhart, 436 F.3d 1163, 1167–68 (10th Cir. 2005).

Because the ALJ identified that Skalka had transferrable clerical skills based on Distefano's testimony, she met her burden to show that Skalka could do clerical work with "very little vocational adjustment" despite her "approaching retirement age." 20 C.F.R. § 404.1568(d)(4); Poupore, 566 F.3d at 306.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the government's cross-motion for judgment on the pleadings and DENIES Skalka's. The Court respectfully directs the Clerk of Court to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: March 31, 2019
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge